**LOCAL 130, INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Appellant,**

v.

**Frank W. McCULLOCH, Howard Jenkins, Boyd Leedom, et al., Appellees.**

**No. 18650.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 6, 1965.

Decided March 25, 1965.

1. United States v. State of Maryland, 116 U.S.App.D.C. 259, 322 F.2d 1009 (1963).

Mr. Winn I. Newman, Asst. Gen. Counsel, IUE, of the bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of court, with whom Messrs. Benjamin C. Sigal and David S. Davidson, Washington, D. C., were on the brief, for appellant.

Mr. Stephen B. Goldberg, Atty., N. L. R. B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary Green, Atty., N. L. R. B., were on the brief, for appellees.

Before DANAHER, BURGER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

██ This appeal from an order of the District Court dismissing a complaint for injunctive relief presents the issue of that court's jurisdiction to review a determination by the National Labor Relations Board to hold a representation election under Section 9(c) (1) (B) of the National Labor Relations Act, 49 Stat. 449 (1935), as amended, 29 U.S.C. §§ 151–168. The District Court, after making findings of fact, concluded that it was without jurisdiction to afford the relief sought. Viewing the issue before us in the context of the inter-union conflict which gave rise to it, and bearing in mind the predominant role which Congress has assigned to the Board in representational matters, we affirm the action of the District Court.

I

The facts as found by the District Court are not challenged in any essential particular,[1] and we look to those findings as framing the controversy before us. The employer involved in this case, Westinghouse Electric Corporation, conducts industrial operations at Baltimore's Friendship International Airport. This business is comprised of an Air Arm Division and an Electronics Division, housed in separate buildings. The 2,200 production and maintenance employees of the former have for many years been represented by the International Brotherhood of Electrical Workers (IBEW); and appellant, the International Union of Electrical, Radio and Machine Workers (IUE), has been the similarly certified representative of the 1,500 production and maintenance employees of the Electronics Division. Each division has had its own maintenance department in its own building, complete with separate tools and equipment, supervisory personnel, and welfare facilities; and the maintenance work in each division was assigned only to employees in its own maintenance department. In 1961 Westinghouse concluded that these arrangements for maintenance work were wastefully duplicative. It undertook the construction of a new Maintenance Shop to house the merged maintenance equipment and employee facilities, and it proposed to integrate the two groups of maintenance employees, with work assignments to be made to either division.

This change was made effective July 2, 1962, and was promptly greeted by a grievance claim by IBEW that all maintenance employees thereby came under the IBEW agreement. Upon Westinghouse's refusal to arbitrate this claim under that agreement, IBEW struck the entire Air Arm Division. In response to Westinghouse's complaint of unfair labor practices, the Board's General

---

1. In its brief appellant characterizes these findings as "essentially in accord with the allegations of the complaint and the exhibits attached thereto." Although it purports in a footnote reference to query the support for certain of the findings, appellant concludes that these were either immaterial or not relied upon by the District Court in reaching its conclusions.

Counsel initiated a proceeding and, pending its resolution by the Board, sought an injunction against the strike in the United States District Court for the District of Maryland. In that court on October 4, an agreement was reached that IBEW would not pursue the strike, and that Westinghouse would abandon the unfair labor practice charges in favor of asking the Board to clarify the bargaining units. The court then undertook to hold the suit in abeyance until the Board could dispose of the dispute. Westinghouse implemented its promise five days later by filing a motion for clarification with the Board. It represented that the existing IUE and IBEW certifications were inappropriate if they were deemed to require the continued separation of the maintenance employees, and it asked the Board to place them all in one union or the other. IBEW's answer to this motion renewed its claim that all such employees had come under its agreement, and it requested a clarifying order approving its position. Westinghouse thereafter filed a petition for an election to determine which union should represent the maintenance employees.

While IBEW and Westinghouse were so engaged, IUE looked for protection to the internal machinery of the AFL-CIO for the resolution of jurisdictional disputes. On October 5, 1962, it filed charges under the AFL-CIO Internal Disputes Plan that IBEW had transgressed the "no-raid" provision of the AFL-CIO constitution. IBEW responded with counter-charges against IUE. On December 27, the Impartial Umpire, Mr. David L. Cole, decided in favor of IUE. IBEW thereupon withdrew its answer to Westinghouse's pending motion before the Board, and advised the Board that it disclaimed any interest in the maintenance employees represented by IUE. This did not, however, ease Westinghouse's difficulties in effecting the integration of the maintenance operations. When, in May of 1963, it assigned work in the Air Arm building to two Electronics Division employees, and work in the Electronics building to an Air Arm employee, both unions filed grievances, and IBEW filed unfair labor practice charges with the Board.

The Board, on May 7, 1963, held a hearing on Westinghouse's petition for an election. Both IUE and IBEW appeared in response to notice, but promptly withdrew from the hearing after disclaiming any interest in each other's employees or in any election that might be ordered. After their withdrawal, evidence was received from Westinghouse regarding the integrational changes in the maintenance operations.

The Board, on September 9, 1963, consolidated the motion to clarify and the petition for an election. It denied the union's motion to dismiss these proceedings, partially granted the motion to clarify by severing the new Maintenance Shop from the two prior units, and directed that an election be held to determine which union the employees in the new unit desired to represent them. It found that, although a single maintenance unit had been created in form, it was not functioning as such in fact because of the continuing difficulties with the unions over work assignments. Noting that neither union was then formally claiming to represent all the maintenance employees, the Board provided that either might withdraw from the election by so notifying the Board. If both withdrew, the petition for an election was to be dismissed.

Neither did. The election was scheduled for December 20, 1963. On December 18, IUE filed the present suit. A temporary restraining order was denied, and the election was held. It was won by IBEW, and IUE filed objections with the Board, founded upon the same grounds as those urged in this litigation. The Board's Regional Director reported upon these objections, recommending against their allowance. With the matter pending in this posture before the

Board, the suit was pressed to a conclusion in the District Court.[2]

## II

■ The two principal contentions pressed upon us, as upon the District Court, are that jurisdiction exists because the Board acted (1) in derogation of IUE's constitutional due process rights when it redefined the bargaining unit without according the union a hearing, and (2) in defiance of its explicit statutory authority when it ordered an election despite the absence of a pending union claim to represent all the employees in the unit. In so articulating its objections, IUE tacitly recognizes that the courts have repeatedly admonished that any jurisdiction they may have to review indirectly the Board's actions by injunctive interference, as distinct from the direct review provided by Congress in the Act, is highly exceptional in nature.[3] This is especially true of representational matters arising under Section 9, and the requisite showing of statute violation or constitutional deprivation must be strong indeed to justify the intrusion of the courts into the Board's processes. The specialized and perennially complex problems of labor-management relations have long been an object of Congressional concern, resulting in a conscious choice to commit their resolution in the first instance to the care of an expert administrative tribunal, with only limited provision made for scrutiny by the more generalized agency of the courts. It is with this insistent knowledge of legislative policy, and of judicial deference

thereto, that we consider IUE's arguments for a departure from the norm.

■ Its constitutional claim need not detain us long. The due process right to a fair hearing is not a precise formulation, susceptible of automatic application in each setting in which it is asserted. But it is certainly true that the right does not comprehend in every case actual participation in a hearing as distinct from the opportunity to participate. The District Court found that IUE had notice of the Board's hearing on May 7, 1963, that it appeared at such hearing, and that it voluntarily withdrew when its objections to the hearing's going forward were unavailing. The District Court concluded that the issue raised by the motion to clarify and by the petition for an election were essentially the same, and that the hearing convened by the Board gave all parties, including IUE, a full and fair opportunity to submit evidence and to assert positions founded upon it. We agree. When IUE chose to forego that opportunity, we think it acted at its peril, at least as regards any subsequent claim that there was a procedural due process lapse of such enormity as to create equitable jurisdiction to intervene. It seems to us clear from the record that IUE was adequately aware that the Board intended at its hearing to explore all the facts and issues relevant to the resistance by the unions of Westinghouse's integration of the maintenance employees. Of course it did not have to take part if it did not want to, but neither can it later claim the

2. The District's Court's decision was issued February 26, 1964. Its last finding of fact refers to appellant's objections to the election as "presently pending before the Board." The Board's brief states that the Regional Director's report was subsequently adopted by the Board.

3. The fountainhead of doctrine in this area is, of course, Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Having recognized the possibility in that case that equity jurisdiction may be invoked, the Supreme Court has since been assiduous in its reminders that that case created only a "limited excep-

tion" to the general policy against district court jurisdiction. McCulloch v. Sociedad Nacional de Marineros, 372 U.S. 10, 16, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). Only considerations of the most urgent kind affecting our international relations were thought to justify this second foray into the forbidding area of non-statutory review of Board action. In declining to sanction district court jurisdiction a third time, Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964), the Court cautioned against extending the "narrow exception" of Leedom v. Kyne.

privilege of ventilating the same facts and issues in the District Court. The reach of the constitutional right is not to be defined by the tactical decisions of the litigant. The hearing provided by the Board in this instance was, in our view, commensurate with the Board's obligations under both the Constitution and the statute.[4]

IUE's second jurisdictional base assertedly rests upon the Board's flouting of the exact language of the Act. It directs our attention first to Section 9(c) (1) (B), which provides that the Board may, after investigation and hearing, direct an election in response to the filing of a petition "by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in subsection (a) * * *." Section 9(a) confers the status of exclusive bargaining representative of all the employees in an appropriate unit upon the organization selected for that purpose by a majority of such employees. The argument is that Westinghouse's petition, filed February 14, 1963, was deficient because, prior to that time, IBEW had abandoned its claim that all maintenance employees had come under its agreement. Since IUE had never made such a claim, it is argued that Westing-

house's petition could not be in conformity with the requirements of Section 9(c) (1) (B), and that, accordingly, the Board's holding of an election is patently in excess of its statutory authority.

But to say that there are possible infirmities in an action taken by the Board by reason of an erroneous or arbitrary exertion of its authority in respect of the facts before it is not to conclude that there is jurisdiction in the District Court to intervene by injunction. For such jurisdiction to exist, the Board must have stepped so plainly beyond the bounds of the Act, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court even before the Board's own processes have run their course. Infirmities short of this may or may not exist in the Board's order here under attack, but that question is not now before us, any more than it was before the District Court; and we intimate no opinion with respect to it. Our inquiry is into the jurisdiction of the District Court to review the Board's order, and that inquiry touches only tangentially upon the merits of the order as those merits would be appraised in a statutory review proceeding. We are not now functioning as a Court of Appeals reviewing Board orders in the manner provided by Congress.[5]

---

**4.** It was urged that we need not reach the constitutional issue by the device of holding that the denial of a hearing here was incompatible with the spirit, if not the exact letter, of the Act. But, since there was no denial in the view we take of the record, appellant's claim, either in constitutional or statutory terms, is ineffective to create jurisdiction. Compare Fay v. Douds, 172 F.2d 720 (2d Cir. 1949).

**5.** The Supreme Court's opinion in *Boire*, *supra* note 3, reviews at length the legislative history supporting its holding in American Federation of Labor v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), that Section 9(c) orders may be reviewed only as part of the underlying record in an eventual unfair labor practice proceeding. This history reflects a vivid awareness by Congress of the undesirability of outside interference in the

Board's administration of representational matters.

Section 9(d) of the Act provides that, whenever an order directing a party to cease and desist from conduct the Board has found to be an unfair labor practice "is based in whole or in part" upon facts certified following a Section 9(c) investigation,

"such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed * * * and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript."

This provision makes an election order reviewable by a court of appeals when review is sought of a subsequent finding by the Board that actions by a union or by the employer inconsistent with its

That court concluded—correctly, we think—that the record before it furnished no proper occasion for the invocation of its injunctive powers. It did not believe that the Board's actions were in clear contradiction of the mandate of the Act, warranting prompt transfer of the dispute to the courts for resolution. In reaching this conclusion, it exhibited its awareness of the extreme circumspection with which the Supreme Court and this court have approached any departure from the customary channels of judicial examination of Board action. It also was familiar with what the record showed in this case, as well as with the reasons given by the Board as to why it thought it was empowered to exercise its undoubtedly wide discretion in the way it did.

■■■ The relevant facts in this regard are that Westinghouse's efforts to achieve the economies and efficiencies of an integrated maintenance operation early fell afoul of union jurisdictional claims. IBEW closed down the entire Air Arm Division in support of its claim that it was entitled to be the exclusive bargaining representative of all the maintenance employees. The Maryland District Court, with the strike controversy dumped in its lap, temporarily stayed its hand on the basis of representations to it that the parties were agreed that Westinghouse should seek a resolution by the Board. Westinghouse did so, initially by its motion to clarify and later by its related petition for an election. IUE successfully invoked the AFL-CIO's jurisdictional disputes machinery as a protection against IBEW's claims, but it appears that this was of little comfort to Westinghouse in its efforts to integrate the working forces and, incidentally, to make good on its commitment to the Maryland District Court to secure a peaceful solution at the Board level. Even after the Impartial Umpire's decision and IBEW's formal acquiescence therein by withdrawing its claim to be the exclusive representative, work assignments on an integrated basis elicited grievances from both unions, and unfair labor practice charges from IBEW. It was in this state of affairs that the Board, after investigation, decided that, in the language of the statute, it had "reasonable cause to believe that a question of representation affecting commerce" existed, and set the matter for hearing. Upon the evidence adduced at that hearing, it ordered an election, with an option provided to either union to stay out of it or, by making common cause in this respect, to prevent the election from being held at all. Neither stayed out. One won. The other went to court.

We do not find in all this anything like the palpable disregard of the command of the statute that caused us to sustain the jurisdiction of the District Court in Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch, 116 U.S.App.D.C. 243, 322 F.2d 993 (1963). There the Board, through a legal error of its own of which the complaining union was the innocent victim, had created a situation inequitable enough in itself, which it compounded by a flat disregard of the statutory requirement that it certify the results of a representation election. The exercise of equity jurisdiction we sustained in those extraordinary circumstances bears little resemblance to that sought here. Indeed, we were careful to reaffirm the vitality of certain of our decisions denying jurisdic-

earlier order are an unfair labor practice. The Supreme Court in *Boire* reaffirmed the availability of review by this procedure, at the same time making clear that, in all but the exceptional cases, it was the only route to the courts for a party aggrieved by a 9(c) order. We note that IUE has nowhere suggested on this appeal that the Board's action would be protected from judicial scrutiny under any and all circumstances if the District Court's dismissal were sustained. See, in this connection, NLRB v. Local 182, Int'l Bhd. of Teamsters, etc., 314 F.2d 53 (2d Cir. 1963).

tion[6] (116 U.S.App.D.C. at 248 n. 11, 322 F.2d at 998 n. 11):

"These cases were concerned with challenges to Board action in the area of directing elections, and determination of the 'appropriate unit.' Section 9(c) (1) does not use mandatory language in referring to the initial action in certification proceedings. Whether a question of representation exists is within that area of expertise in which courts hesitate to interfere."

Although the door to the federal district courts for those aggrieved by the Board is not, in the present state of the law, wholly closed, neither is it widely ajar. We affirm the District Court's ruling that it afforded no access to this appellant.

Affirmed.

6. Milk & Ice Cream Drivers, etc. v. McCulloch, 113 U.S.App.D.C. 156, 306 F. 2d 763 (1962); Leedom v. IBEW, etc., 107 U.S.App.D.C. 357, 278 F.2d 237 (1960); International Ass'n of Tool Craftsmen v. Leedom, 107 U.S.App.D.C. 268, 276 F.2d 514, cert. denied, 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960); National Biscuit Div. etc. v. Leedom, 105 U.S.App.D.C. 117, 265 F.2d 101, cert. denied, 359 U.S. 1011, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959).